UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BONITA SKRINE,

     Plaintiff,

v.

BARRETT PAVING MATERIALS, INC.,

     Defendant.

Case No. 13-cv-14900
Honorable Laurie J. Michelson

---

**OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [25]**

---

Defendant Barrett Paving Materials, Inc. terminated Plaintiff Bonita Skrine's employment in November 2012. Barrett says that it fired Skrine, a former sales representative, for unsatisfactory sales efforts and performance. Skrine believes that Barrett really discharged her because she is a woman and because she complained to Barrett's human resources department about discrimination. So Skrine filed this action under Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act, alleging unlawful employment discrimination and retaliation.

Before the Court is Barrett's motion for summary judgment on all of Skrine's claims. (Dkt. 25, Def.'s Mot. Summ. J.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2). On this record, Skrine has not shown that Barrett's articulated reasons for termination were pretexts for discrimination. Nor can she show that she engaged in a "protected activity," which is required to establish a prima facie case of retaliation. So the Court will grant Barrett's motion.

## I.

### A.

Barrett Paving Materials, Inc. ("Barrett") manufactures hot mix asphalt and sells it to contractors in Southeastern Michigan. (Def.'s Mot. at 1; Dkt. 26, Pl.'s Resp. to Mot. Summ. J. at 1.) Barrett operates several Michigan plants, and until 2012, one of its plants was in Burton, Michigan. (*Id.*)

Barrett hired Skrine in February 2001 as a Plant Clerk. (Def.'s Mot. Ex. A, Skrine Dep. at 18, 21.) By March 2002, Barrett promoted Skrine to sales representative. (*Id.* at 22.) As a sales representative, Skrine covered customers near Burton, Romulus, and Troy. (*Id.* at 29.) Roughly 90% of her sales were in hot mix asphalt, and the rest were "cold patch." (*Id.* at 30.) Skrine's office was at Barrett's Burton plant. (*Id.* at 29.)

Skrine often worked from home in her role as a sales representative. Under Nelson Wesenberg's supervision (from 2002 to 2006), Skrine only worked an average of two hours per week in the office. (*Id.* at 33.) Wesenberg did not require her to be in the office a minimum number of hours per week, submit time sheets or attendance records, or punch in or out. (*Id.* at 23, 31.) But she spent 15–20 hours per week on the road calling on customers, and she saw her customers "almost every day." (*Id.* at 34.)

John Krispin became Skrine's supervisor in 2006, and Skrine continued to spend only roughly two hours per week in the office. (*Id.* at 23, 42.) She said that Krispin was aware that she worked from home because, "The company supplied me with a fax machine and in all of those notes [sic] Office Max things were delivered to my house." (*Id.* at 228.) Like Wesenberg, Krispin did not tell Skrine that she had to work a minimum number of hours per week or make a

minimum number of sales calls. (*Id.* at 38.) Skrine was not required to maintain a journal of her activities but was required to keep track of her quotes to customers. (*Id.* at 38.)

A performance evaluation from around this time, dated April 6, 2007, noted that Skrine's "overall performance rating" was "meets job expectations." (Pl.'s Resp. Ex. 10.) The evaluation concluded, "Bonnie has a good future with the company. She needs to improve her communication skills—written and verbal." (*Id.*)

As time progressed, Skrine took on more responsibility, and Barrett considered promoting her to sales manager. Though she was not a "manager," she performed some "manager's duties." (Skrine Dep. at 73.) Herman Bobak, another former sales representative, said that at one point Wesenberg and another manager asked him what he thought of the possibility of Skrine's promotion to sales manager. Bobak testified, "I said, 'In fact, she's doing the job now,' you know, because she was handling—she was setting up the monthly budgets, the yearly budgets. She was setting up all the seminars." (Pl.'s Resp. Ex. 8, Bobak Dep. at 13.) James Hollenbeck, another former sales representative, said that he and Bobak would have been "more than on board" with Skrine becoming the sales manager because "[s]he was good." (Pl.'s Resp. Ex. 7, Hollenbeck Dep. at 20.) Bobak also testified that Skrine "got along very well" with her customers. (Bobak Dep. at 26.)

### B.

Skrine never became a sales manager. Instead, in October 2011, Barrett hired Michael Fraker for that position, which made him Skrine's direct supervisor. (Skrine Dep. at 23; Def.'s Mot. Ex. D, Fraker Dep. at 5.) Skrine says the two "had a good working relationship" at first. (Skrine Dep. at 86.)

According to Fraker, his mission was "generally to improve the performance of Barrett's sales department and in particular, the responsiveness of the sales representatives to the needs of our customers." (Def.'s Mot. Ex. B, Fraker Aff. ¶ 3.) Fraker's hiring coincided with Barrett's implementation of JWS, a computer program designed "to track price quotations made by sales representatives to customers." (*Id.* at ¶ 4.) As Skrine explained, JWS was going "full-bloom" with Fraker's arrival. (Skrine Dep. at 64.) Fraker's "hope" was that JWS would help "keep track of our work in a more organized fashion." (Fraker Dep. at 37.) He said that in an early 2012 managers' meeting, he had received negative feedback about the sales force: "stories . . . ranged from I never see salespeople to I have customers that call and say they can't get a hold of salespeople and all points in between." (*Id.* at 36.)

Fraker asserted that it was "an essential job requirement" for sales representatives to "become well versed in the operation of JWS." (Fraker Aff. at ¶ 5.) He also claimed that it was "absolutely critical that data be entered into JWS on a timely and accurate basis." (*Id.*) But he testified that he did not know "how much it was being used" before he became sales manager. (Fraker Dep. at 37.)

According to Fraker, once a sales representative quoted a customer, the representative was supposed to "input the information to JWS which generated an electronic quote." (Fraker Aff. at ¶ 4.) Then, if the customer accepted the quote, JWS would "convert the quote to an order." (*Id.*) Once a customer arrived at a plant to pick up the order, "JWS would then generate a load ticket for the material and an invoice to the customer, reflecting the price contained in the quote or the order and the quantity of the material furnished." (*Id.*) According to Fraker, data from JWS was also used for sales forecasts. (*Id.*)

4

A performance evaluation covering the period from December 1, 2010 to November 30, 2011 noted that Skrine "does need to improve her computer skills to be able to create better and easier to use reports. The sales force will be going through a complete overall [sic] on how we will conduct sales and marketing in the future. This change will add more duties to the sales staff and will require much more reporting, forecasting, and computer time." (Def.'s Mot. Ex. C at 5.) Skrine acknowledged in her deposition that by 2012, when it came to JWS, "I was OK. I wouldn't say I was great." (Skrine Dep. at 183.) Skrine also acknowledged that her entries into JWS may have sometimes been late "in the beginning because we had problems with the system." (*Id.* at 180.)

### C.

Skrine's relationship with Fraker made a turn for the worse. Skrine testified that Fraker "started talking down to me" and told her that she was not working hard enough. (Skrine Dep. at 87.) Skrine also said that Fraker sent "harassing" emails and texts, but she acknowledged that the messages' content simply included "questions about things that happened the day before, you know, why customers did the things that they did and if I didn't answer correctly, he would get upset and yell." (*Id.* at 60.)

Skrine kept working from home after Fraker became sales manager, continuing to spend only two hours per week in the office. (*Id.* at 68.) But Fraker never authorized her to work from home. (*Id.* at 107.)

Matters escalated in July 2012. At that time, Fraker analyzed Skrine's and Hollenbeck's cell phone records "to use their calling patterns as a method of tracking their customer contact and improving upon it." (Fraker Aff. at ¶ 10.) He said that he found that "both employees made and received excessive calls from the geographic vicinities of their respective homes,"

suggesting "both employees spent very little time on the road" and they were "not calling on customers personally with the frequency we had agreed upon." (*Id.* at ¶ 10–11.) He emailed Skrine and Hollenbeck to confront them about his findings. (*Id.* at ¶ 10.)  Hollenbeck abruptly resigned. (*Id.*)

Fraker says that when he met with Skrine, "she shrugged her shoulders and was silent. She offered no explanation." (Fraker Aff. at ¶ 10; Fraker Dep. at 55, 74.) He testified that Skrine did not defend herself by claiming that she was working from home. (Fraker Dep. at 74.) Skrine testified that she "had an explanation" but Fraker "said he didn't want to hear it." (Skrine Dep. at 115.) Fraker acknowledged in his testimony that sales could still have been generated by calls originating from the area of Skrine's home, "But the activities that we were asking them to engage in at that time can't be done from home. You can't visit with a customer face to face from home." (Fraker Dep. at 50.) Fraker testified that he did not know that Skrine had been working from home or had been authorized to do so. (*Id.* at 72.)

On July 19, 2012, Fraker issued Skrine a written warning, noting that she "was not covering assigned customers in a satisfactory manner or covering a geographical area required by the position." (Def.'s Ex. E.) The warning indicated that the "consequence should [the] incident occur again" was "suspension with possible discharge." (*Id.*) Barbara Lixey, a Barrett human resources coordinator, testified that "normally" an employee would not move directly from a first warning to a suspension with possible discharge. (Def.'s Mot. Ex. G, Lixey Dep. at 4.) Skrine testified that she did not actually see the written warning until this litigation but that she understood Fraker's expectations at the time. (Skrine Dep. at 223.) Skrine also testified that Fraker told her at this meeting that she could not work from home anymore. (*Id.* at 157.)

6

According to Skrine, that was the first time he told her not to work from home. (Skrine Dep. at 222.)

### D.

Despite the warning, Skrine continued to work from home in the mornings. (Skrine Dep. at 159.) Her relationship with Fraker soured even further. On September 8, 2012, Skrine called Barbara Lixey with human resources and "said that she thought she was being discriminated against by her boss, Mike Fraker." (Lixey Dep. at 20; Skrine Dep. 140–41.) According to Lixey's notes, Skrine did "not want it to go beyond talking to me and does not want to get anyone in trouble." (Def.'s Mot. Ex. F; Skrine Dep. at 141.)

On September 18, 2012, Lixey and Skrine met for lunch to discuss Skrine's call. Lixey testified that Skrine "never mentioned discrimination at lunch." (Lixey Dep. at 23.) She also testified, "She didn't make a discrimination complaint to me. . . . [D]uring our lunch, she did not mention discrimination at all, and I did not bring it up. . . . I thought, again, it was a personality conflict or misunderstanding." (*Id.* at 23, 27–28.) Lixey's notes included the following complaints about Fraker: "Mike is making assumptions about how she is doing her job," and "Mike wrote her up for being at home in the mornings." (Def.'s Ex. F.) Lixey testified that she told Fraker about what she had discussed with Skrine at the lunch. (Lixey Dep. at 23, 32.) She never followed up with Skrine about any discrimination because Skrine "didn't bring it up again." (*Id.* at 23–24.)

Following the lunch meeting, Skrine met with Fraker, Lixey, and Kelly Eastwood, an assistant human resources manager, on September 27, 2012. (Def.'s Mot. Ex. H.) According to Eastwood's notes, they reviewed the requirements of Skrine's job. (*Id.*) The notes also indicate that Skrine asked for more "face-to-face" communication with Fraker, and he agreed to meet

with her directly each Thursday and as needed on Monday mornings with Duane Gaedcke, the other sales representative at the time. (*Id.*) Eastwood's notes state that after Skrine inquired about the July write-up, Fraker "stated that it went into her employee file unsigned." (*Id.*) The notes also state that Skrine then said that she did not deserve the write up because her previous boss authorized her to work from home "due to her issues with a former plant operator." (*Id.*)   In response, Fraker purportedly "stated that she never informed him of this previous arrangement and she is expected to be working from the Troy plant." (*Id.*) Skrine had been previously reassigned to the Troy plant after Barrett sold its Burton plant. (Skrine Dep. at 118.) Eastwood's notes also indicate that "Mike and Bonnie then agreed to move forward and would let HR know if they had any additional issues." (Def.'s Mot. Ex. H.) Skrine testified that this statement was inaccurate, claiming that she and Fraker "didn't agree or disagree." (Skrine Dep. at 177.)

Skrine said that after this meeting, she did not report any other problems to human resources. (*Id.* at 178.)

## E.

On October 11, 2012, Skrine met again with Fraker, Krispin (Fraker's supervisor), and Eastwood to address her job performance. According to Eastwood's notes, Krispin told Skrine that she failed to meet the expectations addressed in the prior meeting: "Her journals showed she was not meeting with contacts and she was not spending time where she should be. John stated he is requesting forecasts from Mike and he cannot supply them because Bonnie is not submitting her forecasts to him. . . . John stated Bonnie needs to correct her quality of work and spend more face to face time with customers." (Def.'s Mot. Ex I.) Eastwood noted that after further monitoring, Krispin "will make an assessment in a couple of weeks and decide if she will stay with us." (*Id.*) Krispin testified that he told Skrine, "if I didn't see a change in the next few

8

weeks that she would, more than likely, lose her employment here." (Krispin Dep. at 59.) Skrine acknowledged that based on this meeting, "I knew that [Krispin] wasn't happy with me." (Skrine Dep. at 185.) She also said that Krispin told her she was a "substandard employee." (*Id.* at 128.)

On November 8, 2012, Barrett terminated Skrine during another meeting with Eastwood and Fraker. According to Eastwood's notes from the meeting, Fraker "stated that we had spoken to her several times in the past couple of months regarding her performance and she has not made any effort to improve," and thus informed her that Barrett was terminating her. (Def.'s Mot. Ex. J.) Fraker testified that he terminated her "[f]or less than satisfactory sales efforts and sales performance. Not based on quantities or quotas, but on the protocol that we had set forth." (Fraker Dep. at 62.) He testified that Skrine "did not saying anything." (*Id.* at 63.)

Lixey said that either Fraker or Krispin had told her that he had decided to terminate Skrine. (Lixey Dep. at 15.) Fraker testified that he did not conclude that he would have to terminate Skrine until August or September 2012, because "there [was not] a change in the effort being put forth there, even after multiple coaching sessions." (Fraker Dep. at 56.) According to Fraker:

> Despite receiving training in JWS and assistance from me as needed, Bonnie Skrine consistently failed to timely and accurately enter data into JWS. Her entries were frequently dilatory or never made at all, and on numerous occasions contained inaccurate project and/or pricing information. I constantly needed to remind Bonnie both verbally and via email of the need to enter accurate information into the system as closely in time as possible to the date of the verbal quote to the customer. Yet, as late as October of 2012, nearly a year after JWS was implemented, she was still failing in her responsibilities in this regard. Moreover, she showed indifference to making any improvement. This was one of the reasons I ultimately recommended that she be released from her position.

(Fraker Aff. at ¶ 6.)

After Barrett terminated Skrine, it hired a man, Casey Gulick as another sales representative. Asked whether Gulick "replaced" Skrine, Krispin testified, "Yes. I guess you could say that." (Krispin Dep. at 63.)

Skrine maintains that leading up to her dismissal, Barrett treated her unfairly. Skrine testified that Duane Gaedcke, another sales representative, was authorized to quote more favorable prices to her customers. (Skrine Dep. at 89.) Skrine also testified that she generally had the most "difficult" customers. (Skrine Dep. at 91–93.) Finally, though Skrine was written up for working from home, a male employee who failed to open a plant and cost Barrett a customer was not disciplined (Skrine Dep. at 146.)

**F.**

On November 27, 2013, Skrine filed a four-count complaint in this Court. Counts I and II assert that Barrett violated the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") when "it made Plaintiff's sex a factor in disciplining her for working from home and providing her with higher rates to quote customers than similarly situated male employees, such that she could not meet her sales requirements, which Defendant claimed as the reason for her termination." (Dkt. 1, Compl.  ¶¶ 35, 44.) Counts III and IV assert that Barrett also violated Title VII and ELCRA when it terminated her as a result of "complaints" that she made to managers and human resources about alleged discriminatory conduct. (Compl.  ¶¶ 54–55, 59–60.)

On February 13, 2015, Barrett moved for summary judgment on all counts. (Dkt. 25, Def.'s Mot.)

10

**II.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-movant, here Barrett. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

**III.**

Title VII makes it "an unlawful employment practice for an employer to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Similarly, ELCRA provides that "[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of

11

religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a). In general, "[c]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

A plaintiff can prove a discrimination claim under Title VII with "direct or circumstantial evidence." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648–49 (6th Cir. 2012). The same is true under ELCRA. *See Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 192 (Mich. 2003) ("Proof of discriminatory treatment in violation of the CRA may be established by direct evidence or by indirect or circumstantial evidence.") (citing *DeBrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534, 539, 620 N.W.2d 836 (Mich. 2001)).

"Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ondricko*, 689 F.3d at 649 (quoting *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520 (Mich. 2001). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Ondricko*, 689 F.3d at 649 (6th Cir. 2012) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)).

When a plaintiff relies on circumstantial evidence of discrimination, the burden shifting framework from *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to claims under Title VII and ELCRA. *White v. Baxter Heatlhcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Under this framework, Skrine must first establish a prima facie case of discrimination. *See id.* If she succeeds, the burden then shifts to Barrett to proffer a non-discriminatory reason

for terminating her. *See id*. Skrine then would have the burden to show that the proffered reason was a pretext for discrimination. *See id*. at 391–92.

Skrine claims that summary judgment is inappropriate because of direct and circumstantial evidence. The Court turns first to Skrine's assertion that the record establishes direct evidence of discrimination on the basis of sex.

## A.

Skrine offers only one source of supposed direct evidence of discrimination. (Pl.'s Resp. at 12.) Specifically, Bobak testified that Krispin twice allegedly said he was "not going to promote no damn female" to the position of sales manager. (Bobak Dep. at 15, 20.) She claims that this is direct evidence of discrimination because it "illustrates that Krispin associated [her] sex with her job performance and her future with Defendant." (Pl.'s Resp. at 12.) The Court is not persuaded.

For Title VII claims, direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (citation omitted); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("For example, a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent."); *see also Harrison v. Olde Fin. Corp.*, 572 N.W.2d 679, 683 (Mich. Ct. App. 1997) ("[W]hen direct evidence of discrimination is involved, we believe that federal case law provides appropriate guidance for analyzing discrimination claims arising under the Michigan Civil Rights Act").

13

To assess whether isolated or "stray" remarks—such as Krispin's—evidence discrimination, Michigan courts and the Sixth Circuit use largely similar tests. The Sixth Circuit examines the following factors:

> [W]hether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination.

See Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1330 (6th Cir. 1994). Similarly, Michigan courts review the following factors for ELCRA claims:

> (1) Were the disputed remarks made by the decisionmaker or by an agent of the employer uninvolved in the challenged decision? (2) Were the disputed remarks isolated or part of a pattern of biased comments? (3) Were the disputed remarks made close in time or remote from the challenged decision? (4) Were the disputed remarks ambiguous or clearly reflective of discriminatory bias?

Krohn v. Sedgwick James of Mich., Inc., 624 N.W.2d 212, 214 (Mich. Ct. App. 2001). Additionally, the Michigan Supreme Court has held that under the direct evidence test "a plaintiff must establish a causal link between the discriminatory animus and the adverse employment decision." Sniecinski, 666 N.W.2d at 193.

Assuming that Krispin said that he would not promote a female to sales manager, nothing from that remark "requires the conclusion" that discriminatory animus motivated Barrett's much later decision to terminate Skrine. See Ondricko, 689 F.3d at 649. Granted, Krispin's alleged remark is neither vague nor ambiguous. If true, it reflects a discriminatory bias in Barrett's decision not to promote Skrine. But Skrine does not challenge that employment action. She challenges only Barrett's decision to terminate her, and that happened years later. Indeed, Bobak testified that Krispin made the remarks about refusing to promote Skrine in two meetings—one in 2007 and one in 2008. (Bobak Dep. at 20.) Yet, Barrett did not fire Skrine until four to five

14

years afterward, in November 2012. Thus, Krispin's 2007 and 2008 remarks about promotion do not directly relate to Barrett's 2012 termination decision.

Not only did Skrine continue to work at Barrett for several years following Krispin's alleged comments, but Krispin also discharged a male sales representative (Bobak) in the meantime. (Krispin Dep. at 20–21.) And while Krispin was involved in the ultimate decision to terminate Skrine, (Krispin Dep. at 60; Bobak Dep. at 6), his biased remark in the context of a promotion decision years earlier does not *require* the conclusion that Barrett terminated her because of her sex. *See Lawrence v. Syms Corp.*, 969 F. Supp. 1014, 1018 (E.D. Mich. 1997) (supervisor's isolated comment "long before" termination that he was "out to get" old store managers did not even support an *inference* of age discrimination where plaintiff "adduced no evidence that the comment was related to the decision to discharge him.").

Accordingly, Krispin's remarks are not direct evidence that Barrett discriminated against Skrine on the basis of sex when it terminated her.

## B.

In the absence of direct evidence, Skrine can survive summary judgment only via the circumstantial route and *McDonnel Douglas*' burden-shifting framework. Under the first step of of that framework, Skrine must establish a prima facie case of discrimination by showing (1) she was a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class or similarly situated employees outside the protected class were treated more favorably. *See White v. Baxter Heatlhcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

The parties do not dispute that Skrine meets the first two elements—she is a woman, and her termination qualifies as adverse employment action. Barrett challenges Skrine's ability to

15

meet only the last two elements: her qualification and whether similarly situated employees outside the protected class were treated more favorably. (Def.'s Mot. at 9–10.) The Court finds that Skrine has met her burden on these two elements and therefore has established a prima facie case of sex discrimination under Title VII and ELCRA.

## 1.

Under Title VII, "In order to be 'qualified' for her position, [Skrine] must demonstrate that she was meeting her employer's legitimate expectations and was performing to her employer's satisfaction." *See Warfield v. Lebanon Corr. Inst.,* 181 F.3d 723, 729 (6th Cir. 1999). Similarly, under ELCRA, "An employee is qualified if [s]he was performing [her] job at a level that met [her] employer's legitimate expectations." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002) (quoting *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 69 (Mich. 1997).

Barrett argues that Skrine has failed to establish that she was qualified for her position because "Skrine was simply not performing to Barrett's satisfaction" and "concedes that her superiors were not satisfied with her performance." (Def.'s Mot. at 10.) Yet, to urge that Skrine was unqualified, Barrett simply recites the rationale that it also offers as the reasons for her termination: "She continuously failed, nearly a year after [JWS] was implemented, to timely and accurately enter data in JWS. She failed to timely respond to Fraker's requests for sales forecasts. And, she failed to cover her customers in a satisfactory manner." (Def.'s Mot. at 9.) This argument ignores a host of Sixth Circuit precedent.

"A claim of poor work performance is not an absolute bar to a showing of a prima facie case." *See Erwin v. Potter*, 79 F. App'x 893, 900 (6th Cir. 2003) (analyzing qualification in the context of a prima facie case of discrimination under Age Discrimination in Employment Act). In fact, the Sixth Circuit has made clear that it is inappropriate for a court to consider at this stage

the very type of evidence Barrett points to: "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000). In other words, a court "should only consider the employer's proffered reason in the later stages of the *McDonnell Douglas* analysis." *Cicero*, 280 F.3d at 585 (applying *Cline* in ELCRA case), *cited in Mccarthy v. USA Credit Union*, No. 289014, 2010 WL 2629788, at *6 (Mich. Ct. App. July 1, 2010). Thus, for now, the Court must put aside Barrett's proffered reasons for terminating Skrine.

The Court finds that Skrine has offered sufficient evidence to create a genuine issue of material fact as to her qualification as a sales representative. For one, a 2007 performance evaluation indicated Skrine's "overall performance rating" as "meets job expectations" and that she had "a good future with the company." (Pl.'s Resp. Ex. 10.) A later evaluation covering December 1, 2010 to November 30, 2011, a year prior to her termination, reflected a manager rating of "exceeds expectations" in several areas, including competence, reliability, and communication. (Def. Ex. C, at 4.); *see Cicero*, 280 F.3d at 586–87 (taking work history and performance evaluations from several years prior to plaintiff's termination into consideration to establish qualification at prima facie stage). She had also spent over 10 years in her position without a single formal warning until July 2012. (*See* Pl.'s Resp. Ex. 4, Lixey Dep. at 12.)

Furthermore, Bobak, who worked alongside Skrine as late as July 2011, testified that Skrine "got along well with customers." (Bobak Dep. at 26.) Skrine and Bobak also testified that she performed management duties for a time until Fraker was hired. (Skrine Dep. at 70; Bobak Dep. at 13.) While "the mere submission of materials from a co-worker or supervisor indicating

17

that an employee's performance is satisfactory does not create a material issue of fact," *see Warfield v. Lebanon Corr. Inst.,* 181 F.3d 723, 729 (6th Cir. 1999), such statements—along with Skrine's performance reviews and 10-year history as a sales representative—are sufficient for a reasonable jury to conclude that Skrine was qualified.

Still, Barrett contends that because Skrine "concedes that her superiors were not satisfied with her performance, no genuine issue of material fact remains as to whether she was qualified." (Def.'s Mot. at 10.) Barrett cites *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990), where the Sixth Circuit held that there was no genuine issue of material fact as to the plaintiff's qualification because "McDonald does not dispute, but in fact acknowledges that his supervisors were dissatisfied with his job performance in the summer of 1986 when he was discharged." Here, the only evidence that Skrine "conceded" that her supervisors were dissatisfied with her was her testimony that based on the October 2012 meeting with Krispin and Fraker, just prior to her termination, "I knew that [Krispin] wasn't happy with me." (Skrine Dep. at 185.) This admission certainly casts doubt on whether she performed satisfactorily, but the Sixth Circuit has specifically instructed that courts "should look . . . at whether an employee met her employer's legitimate expectations *prior to the event(s) that sparked the termination*." *Cline*, 206 F.3d 651, 663 n.7 (emphasis added).

Thus, Skrine meets the qualification element for her prima facie case of discrimination.

**2.**

Barrett also asserts that Skrine has failed to establish that she was treated differently from similarly situated men. (Def.'s Mot. at 10.) In response, Skrine points to her testimony that another sales representative was allowed to quote better prices to her customers, (Skrine Dep. at 89), that she had the most "difficult" customers, (Skrine Dep. at 91–93), and that though she was

written up for working from home, a male employee who failed to open a plant and cost Barrett a customer was not disciplined (Skrine Dep. at 146). (Pl.'s Resp. at 13–14.)

The issue here is simpler than the parties' arguments suggest: to meet this element of her prima facie case, Skrine must only create a genuine issue of material fact that she was replaced by a man. *See Vincent v. Brewer Co.*, 514 F.3d 489, 494–95 (6th Cir. 2007) ("Vincent has established the fourth element of a prima facie case because the employee who replaced her, Freels, is a man. Given that Brewer hired Freels the day before it laid Vincent off and assigned Freels to work on the same crew as Vincent, a reasonable jury could conclude that Freels was hired to serve as her replacement.") Skrine has met this burden. After Krispin was asked whether a man, Casey Gulick, replaced Skrine, Krispin testified, "Yes. I guess you could say that." (Krispin Dep. at 62–63.) A reasonable jury could thus conclude that Barrett replaced Skrine with a man.

\* \* \*

In sum, the Court finds that Skrine has established all four elements required for a prima facie case of employment discrimination on the basis of sex under Title VII and ELCRA.

## C.

Because Skrine has established a prima facie case of discrimination, the burden shifts to Barrett to proffer a non-discriminatory reason for its decision to terminate her. *See McDonnell*, 411 U.S. at 802.

Barrett has offered several performance-related reasons for why it fired Skrine. For instance, Fraker testified that he fired Skrine for "less than satisfactory sales efforts and sales performance. Not based on quantities and quotas, but on the protocol we had set forth." (Fraker Dep. at 63.) In an affidavit, he also asserted that Skrine had "a complete indifference to

19

improvement," had "difficulties with her JWS responsibilities" and was "habitually late in getting monthly sales forecasts." (Def.'s Mot. Ex. B ¶¶ 16–17.)

Skrine does not dispute that Barrett has met its burden to offer non-discriminatory reasons for her termination. (Pl.'s Resp. at 16.) So the Court proceeds to the last step of *McDonnell Douglas*' three-part framework.

### D.

The Court begins with the pretext analysis under Title VII and then turns to ELCRA.

### 1.

Under Title VII, Skrine can rebut Barrett's legitimate, nondiscriminatory reasons by showing that the reasons: (1) have "no basis in fact," (2) "did not actually motivate [her] termination" or (3) were "insufficient to warrant [her] termination." *See Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 503 (6th Cir. 2007) (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)). Under any method, Skrine's burden is to produce "sufficient evidence from which the jury could reasonably reject [Barrett's] explanation and infer that [Barrett] intentionally discriminated against [her]." *See Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).

Skrine first claims that Barrett's stated reason that she failed to deliver sales forecasts in a timely way "has no basis in fact" because Fraker only noted that reason in his affidavit, not in his deposition. (Pl.'s Resp. at 16–17.)

To show that an employer's reason for termination has "no basis in fact," a plaintiff "must put forth evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.,* that they are factually false." *Abdulnour*, 502 F.3d at 502 (internal quotation marks and citations omitted). Skrine has not done that here. She cites no evidence to rebut Fraker's sworn

20

allegation. And her attack on Barrett's use of an affidavit to supplement Fraker's testimony—for which she cites no authority—implicitly asks the Court to turn on its head a settled principle of law.

The Sixth Circuit has held, "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). However, "[t]he purpose of this rule is to bar the non-moving party in a summary judgment proceeding from creating an issue of fact merely by making *contrary* statements in an affidavit, and does not apply to an affidavit filed by the *moving* party." *King v. City of Eastpointe,* 86 F. App'x 790, 793 n. 1 (6th Cir. 2003) (emphasis added). Fraker's affidavit does not contradict his testimony simply because his testimony did not address the timeliness of Skrine's sales forecast reports. And as the moving party, Barrett was entitled to supplement its own witness's testimony with an affidavit.

Skrine next claims that the "reasoning" in Fraker's write-up was "insufficient." (Pl.'s Resp. at 17.) She points to Lixey's testimony that it was "unusual" to recommend suspension and possible discharge after an employee's first write-up. (*Id.*) She also points to testimony that Fraker never told her she could not work from home. (*Id.*) Finally, Skrine argues that though she did work from home, a jury could conclude she nonetheless performed satisfactorily. (*Id.*)

Skrine's argument misses the mark. Though it may have been abnormal for an employee's first written warning to indicate the possibility of discharge and termination, Skrine fails to tie this oddity to her sex. Moreover, this was not her final warning before her termination. Fraker addressed his expectations for Skrine in a September 27, 2012 meeting. (Def.'s Mot. Ex. H.)  Roughly two weeks later, Fraker and Krispin warned Skrine that she did not meet those expectations and that her job was therefore at risk. (Def.'s Mot. Ex I.) Even so, Skrine's

21

challenge to the reasoning underlying Fraker's initial warning says nothing about whether the reasoning underlying Barrett's ultimate termination decision was insufficient. And she has failed to show that Barrett's reasons for termination were insufficient because she cannot point to any "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which [Barrett] contends motivated its discharge of [her]." *See Gray v. Toshiba Am. Consumer Products, Inc.*, 263 F.3d 595, 600 (6th Cir. 2001) (quoting *Manzer*, 29 F.3d at 1084).

No testimony suggests that Barrett declined to discipline male sales representatives for untimely data entry, late sales forecast reporting, or "less than satisfactory sales performance." Though Skrine and Lixey testified that Barrett chose not to discipline another male employee, Kevin Cece, his conduct was not at all similar to Skrine's performance issues. (*Id.* at 145–46; Lixey Dep. at 29.) Cece was not a sales representative, and his conduct involved failing to open a plant for a customer. (*See* Skrine Dep. at 145–46.)

The only evidence concerning other sales representatives' performance surrounds Fraker's dismay that both James Hollenbeck and Skrine worked from home routinely. And Skrine acknowledged in her testimony that Fraker objected to each of them working from home. (Skrine Dep. at 120.) Fraker's objection to Hollenbeck's conduct—and his abrupt resignation—if anything, suggest that Fraker started Hollenbeck down the same disciplinary track as Skrine. Thus, the evidence does not support an inference that Fraker prohibited Skrine from working from home while he turned a blind eye to male sales representatives.

Finally, Skrine says that the "entire progression of events" from her September 12, 2012 call to Lixey to the termination is "suspicious." (Pl.'s Resp. at 17.) Skrine argues that "[it] is strange [that she] contacted Lixey to complain about discrimination, and that this phone call

22

turned into two meetings that addressed [her] performance within the course of two months, and was closely followed by her termination." (*Id.* at 19.)

Though Skrine does not say in her brief which of the three rebuttal methods this line of argument falls under, she seems to imply that the timing of her call to Lixey relative to her termination means that Barrett's performance-related reasons did not "actually motivate" her termination. To succeed under this method, Skrine must show "that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup."*Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 503 (6th Cir. 2007) (internal quotation marks and citations omitted). No reasonable jury could find so here.

Skrine's timeline argument cannot support the inference that Barrett terminated her on the basis of sex.  Fraker first formally disciplined Skrine for working from home and failing to cover her customers satisfactorily in July 2012, months before her call to Lixey. (Skrine Dep. at 115; Def.'s Mot. Ex. E.) Afterward, Skrine continued to work from home in the mornings, despite the warning. (Skrine Dep. at 159.) And Barrett first warned Skrine that she needed to improve her computer skills well in advance of her November 2012 termination—in her performance review for the period ending November 30, 2011. (Def.'s Mot. Ex. C, at 5.) Skrine even acknowledged that by 2012 she "wouldn't say [she] was great" at entering data into JWS. (Skrine Dep. at 183.)

All of these issues came to a head during a changing of the guard in the sales department, when Fraker was hired, as he says, "to improve the performance of Barrett's sales department and in particular, the responsiveness of the sales representatives to the needs of our customers."

(Fraker Aff. ¶ 3.) Though Skrine denies in her brief that Barrett tasked Fraker with improving the department, (Pl.'s Resp. at 2), she cites no evidence to the contrary.

Skrine thus did not call Lixey and mention "discrimination" until well after her performance issues began. (Skrine Dep. at 139–141; Def.'s Mot. Ex F.) And Barrett did not terminate her until two months after that call. On one hand, the Sixth Circuit has held that for purposes of establishing a prima facie case of *retaliation*, "in an appropriate case, a gap of three months between the time the employer learns of the protected activity and the adverse employment action may permit a jury to draw a causal-connection inference." *Haji v. Columbus City Sch.*, — F.3d —, No. 12-3520, 2015 WL 4385280, at *3 (6th Cir. July 16, 2015) (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007)). But even in that retaliation context, where timing is especially relevant, the Sixth Circuit has held that "the inference of a causal connection based on temporal proximity alone is tenuous" when an employer's disciplinary action came two and five months after an employee's formal EEOC charge. *See Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999). Temporal proximity is much less relevant for purposes of establishing pretext for a *discrimination* claim. *Adamov v. U.S. Bank Nat. Ass'n*, 726 F.3d 851, 855 (6th Cir. 2013) (noting that plaintiff's temporal proximity argument was relevant to a retaliation claim but "less probative with respect to the idea that the decision to terminate [plaintiff's] employment was made on the basis of his national origin").

The two months that elapsed between Skrine's call to Lixey and her termination simply do not support any reasonable conclusion that the "sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *See Abdulnour*, 502 F.3d at 503 (internal quotation marks and citations omitted). The Court therefore finds that Skrine has failed to offer sufficient evidence to create a genuine issue

of material fact about whether Barrett's reasons for terminating her were pretexts for purposes of her Title VII discrimination claim.[1]

## 2.

Under ELCRA, the requirements for showing pretext are at least as stringent as under Title VII. To reach a jury, "a plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual," but must also show "that it was a pretext for [unlawful] discrimination." *Hazle v. Ford Motor Co.,* 628 N.W.2d 515, 522 (Mich. 2001); *Movsisyan v. IPAX Cleanogel, Inc.*, No. 299235, 2013 WL 2494979, at *7 (Mich. Ct. App. June 11, 2013) ("The dual burden that a plaintiff alleging discrimination has once an employer produces evidence of a nondiscriminatory reason for its action is to create an issue of fact that (1) the proffered reason is either false or not the real or only reason for the action and that (2) a motivating factor for the action was unlawful discrimination.").

For the same reasons discussed above under the Title VII standard, Skrine does not meet the pretext standard under ELCRA. She has not offered evidence sufficient to create a triable issue of fact on whether Barrett's reason for termination was a pretext for unlawful discrimination on the basis of sex.

---

[1] In the facts section of her brief, Skrine notes several comments that Barrett employees made about her and women generally. For instance, Skrine testified that Krispin "made jokes or comments about his wife and women." (Skrine Dep. at 79.) She said that he made perhaps "two or three" such comments, but she could not recall the dates. (*Id.*) Hollenbeck testified that when Skrine once called into a meeting because of a migraine, Fraker said, "I think it's just a woman thing." (Hollenbeck Dep. at 22.) Additionally, Bobak testified that Mike Davis, another Barrett employee, twice said he wanted to get Skrine fired, and referred to her as a "bitch" and a "fat ass." (Bobak Dep. at 22–23.) Skrine raises no arguments about these comments, so the Court does not address them. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.")

* * *

In sum, summary judgment is appropriate in Barrett's favor because Skrine has failed to show that a reasonable jury could find that Barrett's stated nondiscriminatory reasons for firing her were pretextual.

## IV.

Remaining for consideration are Skrine's retaliation claims under Title VII and ELCRA.

To establish a prima facie case of retaliation under Title VII, Skrine must show: (1) that she "engaged in a protected activity"; (2) that Barrett had knowledge of her protected conduct; (3) that Barrett took adverse employment action toward her; and (4) "that there was a causal connection between the protected activity and the adverse employment action." *See Warf v. U.S. Dept. of Veterans* Affairs, 713 F.3d 874, 880 (6th Cir. 2013) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). A prima facie case of retaliation under ELCRA has the same elements. *See Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005) (quoting *DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich. App. 432, 436, 684 N.W.2d 346 (Mich. Ct. App. 1997)).

Barrett argues that Skrine has failed to show that she engaged in "protected activity" for purposes of Title VII or ELCRA, and that she has therefore failed to establish a prima facie case of retaliation. (Def.'s Mot. at 18–20.) Though Title VII and ELCRA have different standards for determining what qualifies as "protected activity," the Court agrees with Barrett: under either standard, no reasonable jury could find that Skrine's interactions with Barrett's human resources personnel amounted to protected activities.

26

### A.

Title VII makes it "unlawful . . . for an employer to discriminate against any . . . employe[e] . . . because [she] has *opposed* any practice made . . . unlawful . . . by this subchapter, or because [s]he has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (emphasis added). Thus, "protected activity" includes "opposition" to unlawful employment discrimination and "participation" in investigations or proceedings surrounding unlawful discrimination.

Title VII's participation clause "protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003) (citing *EEOC v. Total Sys. Serv., Inc.*, 221 F.3d 1171, 1174 n. 2 (11th Cir. 2000); *Total Sys. Serv., Inc.*, 221 F.3d at 1174 n. 2 (holding that the participation clause protects participation in activities that "occur in conjunction with or after the filing of a formal charge with the EEOC," not participation "in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC"). No evidence suggests that Skrine filed an EEOC charge prior to her termination. Accordingly, Skrine cannot establish that she engaged in protected activity via Title VII's participation clause.

But unlike the participation clause, "[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *See Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citation omitted); *see also Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir.2012) ("We have repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected

activity for purposes of establishing a prima facie case of retaliation."). "Title VII does not protect an employee, however, if his opposition is merely a 'vague charge of discrimination.'" *Yazdian v. ConMed Endoscopic Technologies, Inc.*, — F.3d —, No. 14-3745, 2015 WL 4231698, at *6 (6th Cir. July 14, 2015) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). "Although vague complaints do not constitute opposition, '*Booker* does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision.'" *Yazdian*, 2015 WL 4231698, at *6 (quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)).

Skrine makes no argument here aside from a conclusory assertion that she "engaged in a protected activity when she contacted Lixey to advise that Fraker was discriminating against her." (Pl.'s Resp. at 15.) Though Skrine called Lixey, a Barrett human resources Manager, on September 12, 2012, and mentioned "discrimination," no evidence supports an inference that this was anything beyond a "vague charge of discrimination," which does not qualify as "protected activity." *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 431 (6th Cir. 2014) (expressing doubt that a letter that used the word "discriminatory" but that did not "directly state that [Plaintiff] believed he was being discriminated against on the basis of his race" qualified as protected activity); *see also Malouf v. Detroit Med. Ctr.*, 2013 WL 308724, at *7 (E.D. Mich. Jan. 25, 2013) (holding that email referring to "sexual harassment complaint" and "EEOC investigators" but without "specific allegation that Defendants engaged in an unlawful employment practice" was not opposition).

No one disputes what happened during Skrine's September 12, 2012 call to Lixey. According to the notes Lixey took during the call, Skrine called to "inquire about who she could talk to regarding her (alleged) discrimination by Mike Faker." (Def.'s Ex. F.) But the notes do

not reflect that Skrine went into detail or specifically indicated which type of discrimination (*e.g.*, sex) was at issue. (*Id.*) And in her deposition, Skrine confirmed that Lixey's notes were accurate and did not omit anything from the call. (Skrine Dep. at 140.) She also confirmed that she did not get into any "details" on the call. (Skrine Dep. at 141.)

> Lixey's testimony further highlights the vagueness of Skrine's statements during the call:

> She called me and said that she thought she was being discriminated against by her boss, Mike Fraker. I asked her if she wanted to talk to me; she said yes. She said she did not want to get anybody into trouble. I said if there was – something illegal going on or some discrimination, then I would have to pursue that, or a violation of any company policies. So, we agreed to meet off-site. We had lunch. I asked her if I could take notes, and she said yes. I asked her if Kelly Eastwood could come with us, and initially Bonnie said yes, and then she changed her mind, said that she didn't know her and didn't trust her. So we had lunch, I took notes, she never mentioned discrimination. She complained about several people in the company, not getting along with them, and specifically, about Mike Fraker, her boss.

(Lixey Dep. at 20–21.) Lixey thus ultimately concluded that the issue between Skrine and Fraker was a "personality conflict." (*Id.* at 27–28.)

In sum, Skrine's mere mention of the word "discrimination" in one conversation with a human resources manager does not mean that she opposed an unlawful practice and thus engaged in protected activity under Title VII.

## B.

Similar to Title VII, ELCRA prohibits retaliation against an employee "because the person has opposed a violation of this act or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under this act." M.C.L. § 37.2701(a). A broader standard than Title VII applies to determine whether an employee engaged in protected activity.

In *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989), the Sixth Circuit interpreted ELCRA to adopt the above mentioned standard that subsequent Sixth Circuit decisions have applied to Title VII's opposition clause: "[W]e hold that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. An employee may not invoke the protections of the Act by making a vague charge of discrimination." *See also Willoughby v. Allstate Ins. Co.*, 104 F. App'x 528, 531 (6th Cir. 2004) (applying *Booker* in a Title VII context). However, the Michigan Court of Appeals expressly rejected *Booker*, holding that to engage in protected activity under ELCRA, it suffices that an employee "rais[e] the spectre of a discrimination complaint." *McLemore v. Detroit Receiving Hosp. & Univ. Med. Ctr.*, 493 N.W.2d 441, 443 (Mich. Ct. App. 1992) (noting strong disagreement with *Booker*); *see also United of Omaha Life Ins. Co. v. Rex Roto Corp.,* 126 F.3d 785, 789 (6th Cir. 1997) ("[T]his court is bound by decisions of the state's intermediate appellate courts unless convinced that the Michigan Supreme Court would decide the question differently[.]").

Though Michigan courts have applied the "spectre of a discrimination complaint" standard to both the "participation" and "opposition" clauses of ELCRA's retaliation provision, courts have applied further requirements to protected activity in the form of "charges." Under ELCRA's "charge" clause, "an employee must do more than generally assert unfair treatment." *Barrett v. Kirtland Community College*, 628 N.W.2d 63, 72 (Mich. Ct. App. 2001). Instead, the "charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to [ELCRA]." *Id*.

Although the ELCRA standard is more favorable to her, Skrine fails to cite it in her response—and instead asks the Court to apply Title VII standards. (Pl.'s Resp. at 19.) She

30

therefore does not assert whether her call to Lixey was protected activity under ELCRA in the form of a "charge," "opposition," or "participation." Nonetheless, Skrine has failed to demonstrate that she "raise[d] the spectre of a discrimination complaint."

Again, though Skrine used the word "discrimination" in her September 12, 2012 call to Lixey, no evidence suggests that she specifically referred to discrimination on the basis of her gender. *See Barrett*, 628 N.W.2d at 72 (stating that "generic, non-sex-based complaints regarding . . . working conditions" did not raise specter of discrimination claim); *see also Mitan v. Neiman Marcus*, 613 N.W.2d 415, 416–17 (Mich. Ct. App. 2000) (holding that employee's written complaints referencing "job discrimination" and "job harassment"—but not noting discrimination on the basis of disability—did not "raise the specter that plaintiff either opposed a violation of the [Michigan Handicappers' Civil Rights Act] or 'ma[k]e a charge . . .' under the act."). No evidence indicates that she ever followed up with any discrimination claim after that call. Moreover, Skrine expressly indicated in her call to Lixey that she did not want to get anyone in trouble. (Skrine Dep. at 139–141; Def.'s Mot. Ex F.) Thus, there is no reasonable inference that Skrine's general, one-off mention of the word "discrimination" "opposed" or otherwise "raise[d] the spectre of a discrimination complaint."

\* \* \*

Because Skrine has failed to offer evidence sufficient to create a jury issue on whether she engaged in a protected activity under Title VII or ELCRA, she has not established a prima facie case of retaliation.

**C.**

Even if Skrine could establish a prima facie case of retaliation, because Barrett has offered a legitimate reason for termination, Skrine would still have to meet her burden to create a genuine issue of material fact concerning whether Barrett's reasons were pretexts. *See*, *e.g.*, *Chen v. Dow Chemical Co.*, 580 F.3d 394, 402 (6th Cir. 2009) ("Like Title VII intentional discrimination claims which lack direct evidence of discrimination, retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden shifting framework"); *Debano-Griffin v. Lake Cnty.*, 828 N.W.2d 634, 638 (Mich. 2013) (relying on ELCRA discrimination precedent to hold that *McDonnel Douglas* applies to Whistleblower Protection Act retaliation claims). For the reasons given regarding Skrine's discrimination claims, she cannot meet that burden.

**V.**

For the reasons stated above, Skrine has failed to create a jury question on her discrimination and retaliation claims under Title VII and ELCRA. Therefore, Barrett's motion for summary judgment is GRANTED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  September 4, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 4, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson